UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ELLIS JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.  13-cv-02405-JD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

These findings of fact and conclusions of law are based on the documentary evidence and testimony admitted during the bench trial of this case in April 2016, and are made pursuant to Federal Rule of Civil Procedure 52(a)(1).  The claims for trial were assault, battery, false arrest, and intentional infliction of emotional distress, arising out of an incident in January 2012 between Plaintiff James Ellis Johnson and Department of Veterans Affairs ("VA") police officers at the San Francisco VA Medical Center.  The case was tried to the Court without a jury because the claims are subject to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA").  Johnson, acting pro se, and defendant the United States of America each conducted direct and cross-examinations of fact and expert witnesses, moved documents into evidence, and filed post-trial briefs.

In light of the evidence and testimony admitted at trial, the Court's observation of the demeanor, credibility and candor of the witnesses, and the arguments of parties at trial and in the post-trial briefs, the Court finds in favor of the United States on all the claims except for battery. The Court finds in favor of Johnson on the battery claim because it was unreasonable under the circumstances of this case for the police to have kept him in handcuffs for three straight hours.

The trial was the culmination of almost three years of heavy litigation between the parties. The Court tried to obtain pro bono counsel for Johnson and guided him to the Northern District's Legal Help Center, but Johnson ended up handling the whole case on his own. Despite acting pro se, Johnson actively prosecuted the case and engaged in extensive law and motion practice, discovery and other work to develop his case. The United States was also very active in its defense. The docket for this matter has over 300 entries, and two district judges and a magistrate judge played significant roles in managing the case. A substantial measure of party and judicial resources has been invested in taking this case to judgment.

## BACKGROUND

1.     In light of the case's complex history and the volume of filings, the Court provides this background on the litigation. Plaintiff James Ellis Johnson is a veteran of the United States Army and has suffered from a number of serious health issues. His medical problems have included, among other conditions, knee, shoulder and back injuries, arthritis and heart disease. Tr. 127:24-128:18 (Kim); Tr. 172:11-21, 183:9-14, 186:12-15 (Nakamura); Tr. 55:16-18 (Lim); Tr. 165:17-19 (Price). [1]

2.     Johnson has had a long and somewhat troubled history of interactions with the VA medical system. He has received treatment from the VA since his discharge from the Army in 1993. In 2010, he sued the VA, unsuccessfully, for medical malpractice. *See Johnson v. United States*, No. 10-cv-647-LB, 2012 WL 1094322 (N.D. Cal. March 30, 2012) (granting summary judgment to the United States), *aff'd*, 606 F. App'x 345 (9th Cir. 2015). On August 22, 2011, he was placed under an "Order of Behavioral Restriction" ("OBR") for all of his visits to the VA Medical Center in San Francisco. Tr. Exh. 161. The OBR was imposed after Johnson behaved aggressively with VA personnel and required him to check in with VA police when he arrived at the medical center and before going to see his doctors. *Id*. On January 30, 2012, while the OBR was in place, Johnson was arrested for disorderly conduct and refusing to obey a police officer during a visit to the San Francisco VA Medical Center for a doctor's appointment.

---

[1] The trial transcript is located in the ECF docket at Dkt. Nos. 303 and 304.

United States District Court
Northern District of California

United States District Court
Northern District of California

3.      Johnson filed this suit pro se on May 28, 2013, alleging a number of claims against the United States under the FTCA, and civil rights claims against the City and County of San Francisco and several individual defendants.  Dkt. No. 1.  The Court ultimately dismissed the City and County of San Francisco from the case and dismissed claims against the United States relating to the OBR and for slander and criminal violations.  Dkt. Nos. 75, 119, 155.  The Court also dismissed all the claims against the individual defendants, and claims for malicious prosecution, excessive force, failure to intervene, and California penal code violations.  Dkt. No. 119.  Johnson had the opportunity to amend the complaint twice in the course of the pleadings challenges.  Dkt. Nos. 83, 126.  At the end of the motion to dismiss process, the United States stood as the sole remaining defendant.  Dkt. No. 83.

4.      Several waves of other filings followed the pleadings motions.  Johnson filed several motions for entry of default and default judgment, Dkt. Nos. 12, 37, 41, 42, 47, 51, a motion to return the case to the district judge who handled the matter before reassignment to this Court, Dkt. No. 107, motions for sanctions, Dkt. Nos. 51, 69, 70, and other requests.  *See, e.g.,* Dkt. Nos. 120, 125, 127.  Johnson asked the Court to reconsider almost every decision and order it issued.  Dkt. Nos. 58, 59, 80, 116, 121, 157, 175, 221, 241, 270.  He also asked for and received multiple extensions of the discovery deadlines and other continuances of case management dates.  Dkt. Nos. 164, 181, 197, 207, 216, 222, 236, 237, 258, 267.

5.      The parties engaged in a discovery war that buried the Court in motions and other communications.  Because of the frequency and volume of these filings, the Court ultimately made a referral to Magistrate Judge Nandor Vadas "to address any discovery disputes or other issues that may arise in the case moving forward on a prompt and informal basis to the extent appropriate."  Dkt. Nos. 170, 187, 206.  As this referral makes clear, Judge Vadas handled discovery issues only.  He did not rule on any substantive motions or issues.  Johnson appealed most of Judge Vadas's rulings to the Court.  *See, e.g.,* Dkt. Nos. 217, 244, 256, 257.

6.      As trial approached, the parties' ability to work together went from bad to non-existent, and the Court was required to resolve on shortened time a blizzard of disputes over trial issues.  *See* Dkt. Nos. 281-289, 292, 294.  A last-minute request by Johnson to continue the trial

United States District Court
Northern District of California

1    for sixty days was denied in light of the already long duration of the case, the multiple

2    continuances and extensions he had already received, and Johnson's failure to show that he would

3    in any way be prejudiced or put in an unfair position by going to trial as scheduled.  Dkt. Nos.

4    279, 281.

5         7.    Unfortunately, the heated interactions between the parties led to highly

6    inappropriate language and personal attacks in submissions to the Court.  While the United States

7    was not an entirely innocent bystander, most of the inappropriate conduct came from Johnson.  On

8    several occasions Johnson used uncivil and insulting language to accuse counsel for the United

9    States of racial prejudice, criminal conduct, and other bad acts.  *See, e.g.*, Dkt. Nos. 217, 270, 300,

10   313.  On some occasions, he used similar language about the Court.  None of these accusations

11   had a shred of evidence to support them, and the Court advised Johnson more than once that

12   disparaging and insulting comments have no place in any filing or communication with the district

13   court, including those by a pro se litigant.  *See, e.g.*, Dkt. Nos. 218, 273.

14        8.    The Court held a two-day bench trial on April 25-26, 2016.  Dkt. Nos. 297-98.

15   Twenty witnesses testified, including VA police officers, several treating physicians, Johnson, and

16   two expert witnesses.  The Court directed the parties to file simultaneous post-trial briefs thirty

17   days after they had received the trial transcript.  Dkt. No. 298.  The parties were advised that these

18   briefs "should address only the evidence presented at trial and explain its import under the law."

19   *Id.*  Johnson says that these post-trial briefs amount to "new evidence being admitted after the

20   trial," or a "new trial," Dkt. No. 309, but that is patently untrue and is rejected as an objection to

21   these findings.  Johnson has also objected, without any evidence, that "[h]undreds of pages of the

22   trial transcript were changed," warranting an investigation, arrest of the U.S. Attorney, or a new

23   trial.  Dkt. No. 313.  This allegation is also without any basis and is overruled.

24        9.    The Court understands that Johnson has strong personal views about the facts and

25   what evidence is or is not relevant to his claims.  But the Court is bound by the evidence admitted

26   at trial and governing law, and these findings of fact and conclusions of law are based exclusively

27   on those sources.

28

4

**FINDINGS OF FACT**

10.     Plaintiff James Ellis Johnson is a veteran of the United States Army with multiple health issues.  His health challenges include arthritis in the knees, heart disease, and injuries to his shoulders and back.  Tr. at 127:24-128:18 (Kim); Tr. 172:11-21, 183:9-14, 186:12-15 (Nakamura); Tr. 55:16-18 (Lim); Tr. 165:17-19 (Price); Tr. Exh. 8.  Johnson sustained a left shoulder injury in 1990, which was diagnosed as a moderate impingement syndrome with partial rotator cuff tear and mild inflammation.  Tr. 181:9-182:22 (Nakamura); Tr. Exh. 8.  In 1992, the measured range of motion of his left arm was somewhat limited: its external rotation capability was 20 (below the normal range of 45-60), but its internal rotation capability was 90 (in the normal range), the same as his right side.  Tr. 177:24-178:18, 24-25, 184:10-185:1 (Nakamura); Tr. Exh. 8.  The degree to which this injury may have impeded Johnson's movement or was healed as of 2012 is not known. *See, e.g.*, Tr. 179:2-13, 19-20, 181:20-21, 185:3-8 (Nakamura).  He sustained a back injury in about 1991 and underwent major back surgery at the VA well before 2012.  Tr. 186:12-15 (Nakamura); Tr. Exh. 3 at 1, 2, 9; Tr. Exh 8; Tr. Exh. 12.

11.     On August 22, 2011, the San Francisco VA Medical Center issued an OBR that required Johnson to check in with San Francisco VA police before proceeding with any visit there. Tr. Exh. 161.  An OBR is typically imposed in response to reports by staff or other patients that an individual has acted in a threatening or violent manner.  Tr. 97:7-10, 98:1-5 (Nicoll).  The Disruptive Behavior Committee at the VA, which is a multi-disciplinary team of psychologists and psychiatrists, risk management specialists and police representatives, evaluated Johnson's conduct and formulated the OBR's terms and conditions.  Tr. 97:11-13, 17-20, 98:6-15 (Nicoll). The chief of staff of the medical center did an independent assessment as well.  Tr. 70:4-7, 98:19-99:2 (Nicoll).  The OBR advised Johnson that under federal regulations, the "VA may restrict the time, place and manner of medical care to veterans" who pose a risk of disruptive behavior.  Tr. Exh. 161.  The OBR also advised Johnson that after he checked in at the VA facility, "officers will be nearby during your visits.  They will not interfere with your visits unless you become disruptive.  If you become disruptive, VA Police will immediately escort you from the Medical Center grounds and you will not be permitted to return that day, except for evaluation of

United States District Court
Northern District of California

potentially life-threatening emergencies." *Id*.  The OBR did not restrict the discretion of VA police to accompany Johnson to appointments or to show up later, as long as they did not "interfere with" the appointments.  *See id*.  Specifically, the OBR did not in any way restrict the conditions or circumstances under which VA police might accompany Johnson to appointments or arrive later during his visits.  Tr. Exh. 161.  It was not Johnson's responsibility to secure police escort to the appointments, but the police "were to be ready to escort [him] if necessary."  Tr. 73:1-10, 73:24-74:1, 86:8-11 (Nicoll).

12.     After the OBR was issued, the VA's risk management department placed flags in Johnson's medical record and in the VA's Vista computer system to advise VA staff of the OBR.  Tr. 99:9-100:5, 106:20-107:3 (Nicoll).  The terms of the OBR letter sent to Johnson were also typed into his medical record, and thereby made available to his treating physicians and nurses.  Tr. 102:15-103:10 (Nicoll); Tr. Exh. 154.[2]  By its terms, the OBR did not impose any conditions or restrictions on the discretion of the staff to call VA police or request VA police presence in connection with Johnson's visits.  *See* Tr. Exh. 161.  There is no evidence in the record of any conditions or limits on the VA staff's freedom to involve the police in response to concerns they might have had about Johnson's conduct or his compliance with the OBR.

13.     On the morning of January 30, 2012, Johnson checked in with the VA police at the VA medical center as the OBR required.  Tr. 500:16-25 (Johnson); Tr. 86:23-24 (Nicoll).  He then walked to the medical practice area for an appointment with Dr. Meg Pearson.  Tr. 501:5-7 (Johnson).  Johnson was asked by the nurse who took his vitals whether he had checked in with police, and whether police had escorted him.  Tr. 501:12-18 (Johnson).  He told her he had checked in, but was not aware he was required to be escorted by police.  Tr. 501:19-20 (Johnson).  He then observed the nurse making a call to someone he understood to be Dr. Pearson, relating this information.  Tr. 501:23-502:6 (Johnson).  Johnson was directed to wait for Dr. Pearson outside her office.  Tr. 502:6-10 (Johnson).

---

[2] The Court informed the parties it would only consider this exhibit to the extent it comprises notes from August 2011.  Tr. 106:4-5.

United States District Court
Northern District of California

14.     As the consultation began in her office, Dr. Pearson asked Johnson whether he had checked in with the police.  Tr. 221:18-222:4, 243:13-15 (Pearson); Tr. 502:11-21 (Johnson).  Dr. Pearson had the understanding that the OBR required police to be nearby in the clinic during his visits, and the absence of police suggested to her that the OBR protocol had not been followed. Tr. 223:23-24, 224:18-225:8, 225:15-20, 231:7-15, 233:14-23, 243:13-15 (Pearson); Tr. Exh. 165. Johnson told her she should call and ask the police if she wanted to know that.  Tr. 221:25-222:4 (Pearson); Tr. 502:22-503:1 (Johnson).  When Dr. Pearson asked again about Johnson's OBR compliance, Johnson challenged her on the relevance of the question to his health care and said it was none of her business.  Tr. 222:7-13, 243:18-22 (Pearson); Tr. 503:5-7 (Johnson).  Johnson became upset and raised his voice.  Tr. 243:18-244:11, 17-18 (Pearson).  Johnson insisted at trial that he did not raise his voice at any time before his arrest but the Court does not find that testimony credible.  *See* Tr. 509:1-3 (Johnson).  The police arrived in the hallway around this time. Tr. 222:14-19, 244:2-5, 20-25 (Pearson); Tr. 503:8-15 (Johnson).  Dr. Pearson thought police had likely arrived due to a call from clinic staff.  Tr. Exh. 165; Tr. 232:16-18, 23 (Pearson).  While Johnson has been very focused on how and why the police were called, with frequent mentions of "probable cause," the reasons are irrelevant to his legal claims, particularly in light of the terms of the OBR.

15.     VA Police Officers Cody Cowin and Dennis Neeley, and Dr. Pearson, gave consistent and credible testimony at trial about what happened next.  Both officers heard yelling as they arrived at the clinic lobby and passed through security doors that did not block sound.  Tr. 265:3-11, 268:5-7, 269:8-18 (Cowin); Tr. 479:15-23, 487:14-24 (Neeley).  Once Officer Cowin moved around the reception desk, he saw that Johnson was "pretty animated and loud, engaging a staff member of the hospital."  Tr. 276:5-6 (Cowin); *see also* Tr. 479:1-23, 487:18-24 (Officer Neeley recalls seeing Johnson yelling in the hallway).  A group of nurses gathered to monitor the scene, and other staff opened their doors to check on the situation or closed their doors to block it out.  Tr. 246:21-25 (Pearson); Tr. 276:13-18, 321:11-22 (Cowin); Tr. 490:22-491:6 (Neeley).

16.     The officers stood within 20 feet of Johnson.  Tr. 277:4-6 (Cowin).  Johnson's agitation increased as the police arrived.  Tr. 245:1-5 (Pearson).  He challenged the police about

7

their appearance, yelling at them about "probable cause," using profanity, and calling them racists. Tr. at 271:9-17; 277:13-19 (Cowin); Tr. at 320:21-321:3 (Officer Cowin states that Johnson called him a racist, a "Nazi," and a "skinhead," and swore at him); Tr. 236:3-6, 245:6-12 (Pearson) (Johnson called officer a racist and used profanities); Tr. 488:10-21 (Neeley) (same); *see also* Tr. 503:18-504:7, 506:11 (Johnson admits that he asked about probable cause and called officer a racist, but does not recall if he used profanity). The officers described Johnson as yelling, animated, and aggressive. Tr. 321:23-322:2, 322:6-11 (Cowin); Tr. 479:18-23 (Neeley). The officers had encountered Johnson before, and decided to approach him in a low-key way. Tr. 487:25-488:3 (Neeley). Officer Cowin talked to Johnson first and asked him to lower his voice and talk with them about the situation, but Johnson did not comply. Tr. 277:7-12; 321:4-10 (Cowin); Tr. 245:13-246:8, 246:18-20 (Pearson); Tr. 487:25-488:6 (Neeley). This initial interaction went on for a few minutes. Tr. 246:15-17 (Pearson); Tr. 286:9-16 (Cowin); Tr. 487:25-488:9 (Neeley).

17.     As Officer Neeley approached Johnson, asking him to calm down, Johnson started moving toward the officers and turned toward Officer Neeley abruptly. Tr. 488:3-9, 490:1-7, 18-20 (Neeley); Tr. 274:19-21, 281:1-2, 15-21, 323:2-324:15 (Cowin). Officer Cowin saw this as a threat to Officer Neeley and arrested Johnson for disorderly conduct. Tr. 280:1-12, 280:21-281:2, 323:2-324:15 (Cowin); Tr. 488:3-9 (Neeley). Officer Cowin grabbed Johnson's left wrist to handcuff him behind his back with Officer Neeley's help. Tr. 281:18-21, 324:13-20 (Cowin); Tr. 326:6-13 (Officer Cowin demonstrating how handcuffing was performed); Tr. 485:23-24 (Neeley). Officer Cowin testified that he checked the tightness of the handcuffs to make sure they did not impede circulation, and double locked them so they would not inadvertently tighten further. Tr. 325:4-10 (Cowin). Johnson continued to yell at the police officers as he was handcuffed and escorted out of the area. Tr. 236:23-24, 237:4-15 (Pearson). As they walked out of the treatment area to the VA police office, Johnson repeatedly stopped walking and refused to follow commands to proceed. Tr. 282:21-283:8, 284:9-13 (Cowin); 485:3-10 (Neeley). When Johnson refused to walk, Officer Cowin used a standard wrist lock to motivate Johnson to cooperate. Tr. 284:5-13, 327:14-328:19, 339:1-7 (Cowin).

United States District Court
Northern District of California

18.     Johnson's failure to follow commands led to an additional charge of resisting and obstructing a police officer. Tr. 280:1-12 (Cowin).  Neither the officers nor Dr. Pearson recalled Johnson complaining of pain or discomfort from the handcuffs or anything else during the walk, and the officers denied that they would ignore such complaints.  Tr. 247:11-13 (Pearson); Tr. 272:17-22, 329:3-17 (Cowin); Tr. 492:1-23 (Neeley).  Johnson stated that the officer "accommodated" Johnson's request to switch his arm hold from the right shoulder to the left to alleviate pain.  Tr. 507:4-7 (Johnson); Tr. 482:4-483:1 (Officer Neeley recalls Officer Cowin switching arms, but not why).  The arrest occurred shortly after 10:45 am.  Tr. 286:12-16 (Cowin).

19.     The group walked to the VA police office in the medical center building, where Johnson was placed in a holding cell for approximately 20-40 minutes in preparation for transportation to San Francisco County Jail.  Tr. 285:22-286:7 (Cowin).  Johnson was handcuffed throughout this time.  Tr. 485:18-22 (Neeley).  Officer Cowin went into the cell several times.  Tr. 287:20-22 (Cowin).  During one entry, he searched Johnson's personal items incident to the arrest, including his wallet, and took out Johnson's license for inspection.  Tr. 286:21-25, 287:4-5 (Cowin).  Officer Cowin clipped the license to his own pocket when he needed both hands free during the search.  Tr. 287:6-9 (Cowin).  Johnson continued to swear and call the officers racists while in the cell.  Tr. 287:14-18, 330:25-331:15 (Cowin); Tr. 492:24-493:4 (Neeley).  Officer Neeley and Criminal Investigator ("CI") Lucas Coulter were in the VA police office and could hear Johnson in the holding cell, but said they did not hear any complaints of pain or mistreatment. Tr. 459:6-460:6 (Coulter); Tr. 491:15-22, 492:24-493:4 (Neeley); *see also* Tr. 331:16-23 (Cowin).

20.     Officer Cowin and CI Coulter transported Johnson to the San Francisco County Jail at 850 Bryant Street at around 11:40 am.  Tr. 334:21-335:4 (Cowin); Tr. 446:1-4, 466:17-22 (Coulter).  The officers placed Johnson in the rear seat of a Dodge Charger VA police car that was equipped with specially shaped seats to transport handcuffed arrestees.  *See* Tr. 448:20-449:23 (Coulter); Tr. 294:13-16, 295:23-25 (Cowin).  A Crown Victoria police car in the parking area was reserved for the police chief and not equipped to transport arrestees.  Tr. 294:2-8 (Cowin); Tr. 449:3-14 (Coulter).  Following VA police procedure, Officer Cowin and CI Coulter together placed Johnson in the back seat and put a seatbelt on him for the 30-35 minute drive to the jail.

Tr. at 296:3-20, 298:18-20 (Cowin); 450:7-20, 460:7-461:5 (Coulter).  Johnson made derogatory comments to the officers, but CI Coulter did not recall any complaints about pain.  Tr. 463:4-9 (Coulter).

21.     At the County Jail, Johnson was directed to sit in a chair in the sallyport outside until called in by a San Francisco deputy sheriff for booking.  Tr. 299:24-300:19, 332:25-333:8 (Cowin).  According to the captain in charge of the jail, arrestees and arresting officers often have to wait in the sallyport for their turn to be processed through booking, and chairs are provided there for that purpose.  Tr. 34:7-24 (Pecot).  Handcuffs typically are not removed while the arrestee waits in the sallyport.  Tr. 471:2-22 (Coulter).  Johnson spent approximately an hour in the chair before going inside to complete the booking process.  Tr. 303:21-304:2 (Cowin); Tr. 464:15-465:4 (Coulter); Tr. 514:11-13 (Johnson).  Johnson testified he was in "unbearable pain" at this time and begged for relief from the handcuffs during the delay.  Tr. 513:7-14 (Johnson).  Although the testimony was not crystal clear about why Johnson waited this long, both VA officers recalled that other arrestees were ahead of Johnson for booking into the jail.  Tr. 300:11-19, 304:4-14 (Cowin); Tr. 451:13-452:13 (Coulter).  They do not recall Johnson complaining about pain or discomfort during the wait.  Tr. 301:22-302:2, 302:10-20 (Cowin); Tr. 452:14-22 (Coulter).

22.     Officer Cowin and CI Coulter accompanied Johnson through the booking process.  The process starts with determining whether the jail has a booking card or other information on file for the arrestee from prior detentions, which means the information and the photo on the booking card may be out of date.  Tr. 24:9-23 (Pecot).  At this point in the process, the handcuffs are usually removed.  Tr. 309:13-18 (Cowin).  The County Jail officially takes custody and control of the arrestee after he passes medical triage, a process in which a registered nurse asks a number of questions to determine whether the arrestee is in acceptable health and able to be booked safely into the jail.  Tr. 25:2-6, 34:25-35:7 (Pecot).  If the arrestee is not in acceptable condition, he is sent to the San Francisco General Hospital.  Tr. 35:8-9 (Pecot).  Johnson cleared medical triage and was found to be in medically good condition on January 30, 2012 at 1:35 p.m.  Tr. 35:12-36:6 (Pecot); Tr. 335:16-21 (Cowin); Tr. 466:6-8 (Coulter).  At that time, he entered the custody of the

United States District Court
Northern District of California

San Francisco Sheriff's Department.  *See* Tr. 25:2-6 (Pecot).  He was no longer in the custody of the VA police.

23.     Once in custody of the sheriff's department, Johnson had a mug shot taken.  *See* Tr. 25:21-25, 28:1-14, 36:8-12 (Pecot).  The sheriff's department allows sworn law enforcement personnel, such as arresting or transporting officers, to assist with taking the mugshot and escorting an arrestee to a cell.  Tr. 29:8-16, 25, 30:3-4, 30:24-31:11, 36:13-16, 36:24-37:1 (Pecot). Officer Cowin held the ID card when Johnson's mugshot was taken. Tr. 306:17-307:1 (Cowin). CI Coulter and Officer Cowin escorted Johnson to a cell at the County Jail.  Tr. 517:1-4 (Johnson). The length of Johnson's detention by the sheriff's department and the details of his release are not known and are irrelevant to his legal claims, but it appears his confinement was of limited duration.

24.     About one week after the arrest, Johnson called the VA on February 6, 2012, to report left shoulder pain from the incident.  Tr. 249:15-250:3, 250:9-17 (Pearson); Tr. Exh. 110. He made a similar statement to Dr. Abigail Wilson on about April 3, 2012.  Tr. at 111:20-23, 116:9-21 (Wilson), Tr. Exh. 101, at 59-69.  Johnson reported left shoulder pain from the incident to Dr. Alexis Dang as well.  Tr. 131:16-18.  Johnson's physical therapist Carol Clark testified that she treated his left shoulder for impingement syndrome after the incident in April and June of 2012.  Tr. 193:17-23, 194:1-4, 13-19, 201:18-203:5 (Clark); Tr. Exh. 101 at 23, 29.  Johnson reported to Clark that he had sustained a left rotator cuff tear in the military, and that that injury had been aggravated when he was handcuffed.  Tr. 202:6-203:5 (Clark).  None of these care providers, however, offered any testimony about the cause of Johnson's shoulder complaints or expressed the opinion that his shoulder problems were attributable to the incident.  Dr. Wilson did not connect the pain and the arrest.  Tr. 117:25-118:3 (Wilson).  Clark observed that in the April 2012 timeframe, Johnson's left shoulder may have been impacted for independent reasons such as preferential overuse after a March 23, 2012 surgery on his right shoulder.  Tr. 203:6-11, 204:13-205:14 (Clark).  Orthopedic surgeon Hubert Kim testified that Johnson's need for this right shoulder surgery was known as early as 2006.  Tr. 128:11-18, 134:17-135:1 (Kim).  As of June 2012, medical records indicated that Johnson's arms had an internal rotation range of motion that

1    would allow him to "rotate his hand internally and put it behind his back and rest it on his lower

2    back." Tr. 205:15-206:18 (Clark).

3         25.    There is no evidence in the record that Johnson attributed any other injuries or

4    health concerns to the incident in the immediately following time period.  Dr. Wilson's April 2012

5    notes make no mention of Johnson attributing any right shoulder or back pain to the incident.  Tr.

6    116:22-117:24 (Wilson).  She had no opinion on whether the arrest caused him any injury, and did

7    not refer him for any mental health treatment while she served as his internist from April 2012 to

8    May 2013.  Tr. 117:25-118:3, 118:23-119:7 (Wilson).  An orthopedic surgeon who treated

9    Johnson in July 2012 did not note any connection between his back issues and the January 2012

10   incident, and had no recollection of Johnson claiming any connection.  Tr. 48:5-12, 60:23-61:1

11   (Lim).  Johnson conceded that six months before the arrest, in late 2011, a doctor had advised him

12   that he might need back surgery for a then-existing back condition.  Tr. 169:24-170:3 (Johnson);

13   Tr. Exh. 5, Exh. A at Jul. 7, 2011 Visit Note of Dr. Jason Smith (noting Johnson's "low back

14   pain," and stating "it may be reasonable to do a decompression at L1-2 and L2-3" if he "develops

15   progressively worsening" symptoms); *see* Tr. 409:4-10, 417:17-418:18 (Atkin).  That surgery did

16   not take place before January 30, 2012.  There is no evidence that Johnson's need for back

17   surgery, or his complications from that surgery, have any connection to the 2012 incident.

18        26.    Johnson was referred to psychologist Dr. James Howard for evaluation and

19   treatment for emotional distress in late 2015, more than three years after the incident.  Tr. 143:5-

20   21 (Howard).  Dr. Howard expressed the opinion that Johnson has longstanding psychological

21   issues and dysfunctional coping mechanisms that precede 2012 and may have led to a heightened

22   sensitivity to or distorted perception of the January 30, 2012 events.  Tr. 146:24-147:7, 148:24-

23   149:17, 150:1-15, 18-22 (Howard).  Dr. Howard testified that Johnson also has a history of

24   grievances with the VA that the 2012 arrest added to.  Tr. 149:18-150:5, 150:18-22 (Howard).  He

25   viewed Johnson as generally an honest person with the potential for misperceiving his

26   experiences.  Tr. 150:7-15, 153:17-18, 153:22-154:2 (Howard).  He was not aware of Johnson

27   receiving any other treatment for mental health issues.  Tr. 151:16-24 (Howard).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

27.     Both parties offered expert testimony on the topic of Johnson's health complaints and whether they could be connected to the events of January 30, 2012.  Plaintiff's expert Dr. Edwin Ashley reviewed a modest selection of medical records provided by Johnson and did not conduct a physical examination of him.  *See, e.g.*, Tr. 357:19-358:2, 358:19-359:2, 361:14-362:5, 362:10-14, 363:15-18, 363:24-364:4 (Ashley).  Dr. Ashley found no evidence of any acute injury from the incident.  Tr. 377:25-378:4 (Ashley).  Dr. Ashley did not testify that the arrest caused any injury to Johnson's left or right rotator cuffs -- he understood from the records he reviewed that Johnson had pre-existing rotator cuff tears in both shoulders.  Tr. 352:3-5, 365:10-16, 369:13-370:9, 375:15-18 (Ashley).  Dr. Ashley said it was possible that Johnson's handcuffing may have exacerbated Johnson's prior left or right shoulder injuries.  Tr. 371:3-20 (Ashley).  However, he did not know Johnson's reported level of shoulder stiffness before the incident, or whether the handcuffing had involved internal or external rotation of the arms.  Tr. 375:7-14, 377:14-24 (Ashley).  And Dr. Ashley found no evidence in the medical records that the right shoulder had been aggravated in the incident.  Tr. 355:2-6 (Ashley).  Dr. Ashley had no opinion on whether a wrist lock, Johnson's transportation in the police car, or sitting in a chair outside the jail exacerbated any injury.  Tr. 371:24-372:12 (Ashley).

28.     Defendant's expert Dr. Miles Atkin physically examined Johnson and reviewed a much larger set of medical records than Dr. Ashley.  Tr. 389:3-390:15, 392:17-25 (Atkin).  Dr. Atkin testified that handcuffing would not have caused injury to Johnson.  Tr. 391:25-392:4 (Atkin).  He based this opinion on his understanding that the handcuffing involved internal shoulder rotation, not the kind of external rotation that could have caused injury.  Tr. 392:5-9, 393:5-23 (Atkin).  Dr. Atkin also testified that the alleged injuries Johnson ascribed to the wristlock, transportation in the police car, manhandling in the holding cell, and to sitting sideways in a chair outside the jail, were inconsistent with the type of injury the alleged mistreatment could have caused.  Tr. 394:1-398:3, 401:22-402:12, 402:21-403:25 (Atkin).  An MRI on February 24, 2012 showed no acute injury to Johnson.  Tr. 403:11-25 (Atkin).  Dr. Atkin noted that Johnson had been identified as a candidate for surgery in both shoulders and back in 2011, and described Johnson's rotator cuff injuries as equally consistent with his prior injuries and aging.  Tr. 398:22-

1   400:19, 401:1-20, 406:21-407:5, 409:4-10 (Atkin).  Overall, Dr. Atkin saw no objective evidence

2   of injury or exacerbation of injury due to the arrest.  Tr. 404:17-22, 407:13-409:10, 410:7-411:7

3   (Atkin).  At most, he suggested Johnson may have experienced a "mild sprain or strain" that

4   dissipated shortly.  Tr. 405:4-17 (Atkin).

### CONCLUSIONS OF LAW

**A.      Jurisdiction and Venue**

29.      The Court has subject matter jurisdiction over this FTCA action pursuant to 28
U.S.C. § 1346(b)(1).

30.      Venue lies in this Court under 28 U.S.C. § 1391(e) because a substantial part of the
events or omissions giving rise to the claim occurred in this judicial district, and because no real
property is involved in this action and plaintiff resides here.

**B.      Legal Standards**

31.      Under the FTCA, the United States may be held liable for "personal injury or death
caused by the negligent or wrongful act or omission of any employee of the Government while
acting within the scope of his office or employment, under circumstances where the United States,
if a private person, would be liable to the claimant in accordance with the law of the place where
the act or omission occurred."  28 U.S.C. § 1346(b)(1).

32.      In a FTCA action, the United States is liable "in the same manner and to the same
extent as a private individual under like circumstances" and is "entitled to assert any defense based
upon judicial or legislative immunity which otherwise would have been available to the employee
of the United States whose act or omission gave rise to the claim, as well as any other defenses to
which the United States is entitled."  28 U.S.C. § 2674.  The United States is generally immune to
suit based on certain intentional torts, including assault, battery, and false arrest, except when
committed by a federal law enforcement officer.  *Tekle v. United States*, 511 F.3d 839, 851 (9th
Cir. 2007).

33.      Because the events at issue in this case occurred in California, the Court applies
California tort law to Johnson's FTCA claims.  *Avina v. United States*, 681 F.3d 1127, 1130 (9th
Cir. 2012).

United States District Court
Northern District of California

**C.     False Arrest**

34.     Johnson has not proven false arrest by a preponderance of the evidence.  Under California law, false arrest and false imprisonment describe the same "'unlawful violation of the personal liberty of another.'"  *Tekle*, 511 F.3d at 854 (quoting Cal. Penal Code § 236).  To establish this claim, Johnson must prove he was (1) nonconsensually, intentionally confined, (2) without lawful privilege, (3) for an appreciable period of time, however brief.  *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011) (citation omitted).  In the context of an FTCA claim, a federal officer -- like a private person -- has lawful privilege to "arrest someone for a misdemeanor when the offense actually has been committed or attempted in his presence."  *Tekle*, 511 F.3d at 854 (citing *Hamburg v. Wal-Mart Stores, Inc.*, 116 Cal. App. 4th 497 (2004)).  When entitled to make an arrest, even a private person may use reasonable force to detain the person.  *Id*. (citing *People v. Fosselman*, 33 Cal. 3d 572 (1983) (en banc)).

35.     The Court credits the testimony of Officer Cowin, Dr. Pearson and Officer Neeley that they observed Johnson upset, agitated, and making a disturbance in the clinic hallway, including yelling profanities and refusing to acknowledge or respond to the officers' attempts to calm him down.  These facts satisfy the Court that the officers reasonably believed they had witnessed Johnson "maliciously and willfully disturb[] another person by loud and unreasonable noise," in violation of Section 415(2) of the California Penal Code at the time of his arrest. Johnson's refusal despite warnings to calm down and stop yelling, and to stop disturbing clinic operations, supports the conclusion that Johnson's purpose was less to communicate than to disrupt.  *See Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1162 (9th Cir. 2007); *In re Brown*, 9 Cal. 3d 612, 621 (1973) (Section 415 prohibits loud shouting "when there is no substantial effort to communicate or when the seeming communication is used as a guise to accomplish the disruption").  The evidence of Johnson moving in an aggressive manner toward Officer Neeley right before his arrest further supports the inference that his purpose in the incident was not communication, and also indicates that the officers had a reasonable belief that the situation could escalate into violence.  *See In re Brown*, 9 Cal. 3d at 621 (Section 415 prohibits

loud shouting "where there is a clear and present danger of imminent violence"). Because the Section 415(2) arrest was lawfully privileged, the false arrest claim fails.

36.    The Court also credits Officer Cowin's testimony that Johnson repeatedly impeded the officers' attempts to walk with him from the clinic to the VA holding cell by stopping and refusing to follow the officers' instructions to proceed.  On these facts, the Court finds that Officer Cowin reasonably believed he witnessed Johnson in an affirmative act of disobeying or resisting a police officer in in violation of California Penal Code Section 148(a)(1).  Section 148(a)(1) is violated when (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties."  *Yount v. City of Sacramento*, 43 Cal. 4th 885, 894-95 (2008) (internal quote omitted).  There is no dispute on the second two elements, and the Court finds that Johnson's repeated stopping and refusing to follow officer instructions after his arrest supported the Section 148(a)(1) charge.  *See Young*, 655 F.3d at 1164, 1169 (approving Section 148(a)(1) charge for disobeying officer's instructions); *Smith v. City of Hemet*, 394 F.3d 689, 697 (9th Cir. 2005) (same).  Because the Section 148(a)(1) arrest was lawfully privileged, the false arrest claim fails on this ground as well.  After the lawful arrest, the officers also had lawful privilege to detain Johnson and transport him to the County Jail.  *See Webb v. City & Cnty. of San Francisco*, No. C 11-00472 CRB, 2011 WL 6151518, at *6 (N.D. Cal. Dec. 12, 2011) (citing *Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 757 (1997)).

37.    Johnson's desire to focus on why the police were dispatched to the clinic is misplaced.  Johnson has been persistent in arguing that the police were called to the scene improperly and without "probable cause," by which he appears to mean was arrested without lawful privilege.  *See, e.g.*, Dkt. No. 312 at 3-4.  But this point misunderstands the relevant facts and law.  It is not clear exactly how or why the police were dispatched to the clinic, but that does not matter at all to the disposition of Johnson's claims.  Even if the police were dispatched to the scene before any call came in about a disturbance, there was nothing untoward about this.  Under the terms of the OBR that was in effect, the VA police had discretion to accompany Johnson to

16

United States District Court
Northern District of California

appointments. The OBR did not limit this discretion based on whether or not Johnson checked in, on whether VA police walked him to the clinic or showed up later, on whether or not the nurses or doctors were confused about whether he checked in, or if they called the VA police to a disturbance. In addition, there is no evidence suggesting the OBR restricted VA staff from contacting the police in connection with Johnson's visits. How or why the police were dispatched to the scene is simply not relevant to the claims in this case. And contrary to Johnson's view, defendants' motion to dismiss did not "clearly state in writing that their probable cause for arresting Plaintiff was because he showed up at his appointment without a police escort." *Id*. at 6. The cited sections of the motion are actually paraphrasing Johnson's own contentions. *See* Dkt. No. 22 at 3, 11.

38.     The only relevant fact dispute raised during trial was whether Johnson was yelling and causing a disturbance at the time of his arrest. He said no but several other witnesses, including Dr. Pearson, Officer Cowin, and Officer Neeley contradict him. The Court finds the testimony of these witnesses to be credible and persuasive, and accepts it.

### D.     Assault / Battery

39.     With one exception, Johnson has failed to prove assault or battery by a preponderance of the evidence. "Harmful or offensive contact, intentionally done, is the essence of battery, while apprehension of that contact is the basis of assault." *Tekle,* 511 F.3d at 855 (quotation omitted). To prove assault under California law, Johnson must establish that: "(1) the officers threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to him that they were about to carry out the threat; (3) he did not consent to the conduct; (4) he was harmed; and (5) the officers' conduct was a substantial factor in causing the harm." *Id*. To prove battery, he must establish that: (1) defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person, (2) plaintiff did not consent to the contact, and (3) the harmful or offensive contact caused injury, damage, loss, or harm to plaintiff. *Piedra v. Dugan*, 123 Cal. App. 4th 1483, 1495 (2004)); *Tekle*, 511 F.3d at 855.

40.     Because Johnson's assault and battery claims involve the conduct of police officers acting in their official capacities, he "must also establish, for each cause of action, that the officers

17

United States District Court
Northern District of California

1    used 'unreasonable force.'" *Avina*, 681 F.3d at 1131 (quoting *Munoz v. City of Union City*, 120

2    Cal. App. 4th 1077 (2004)).  California applies the reasonableness standard of the Fourth

3    Amendment to the United States Constitution to the question of force.  *Id*.; *see also Gibson v.*

4    *County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002) (Fourth Amendment standard governs

5    claim of excessive force during pretrial detention), overruled on other grounds, *Castro v. Cnty. of*

6    *Los Angeles*, No. 12-56829, 2016 WL 4268955, at *11 (9th Cir. Aug. 15, 2016).  This standard

7    requires that police officers executing an arrest or detention use only such force as is "objectively

8    reasonable" under the circumstances, regardless of their intent or motivation.  *LaLonde v. County*

9    *of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000); *see also Graham v. Connor*, 490 U.S. 386, 397

10   (1989).  "Force is excessive when it is greater than reasonable under the circumstances."  *Santos v.*

11   *Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (citing *Graham*, 490 U.S. at 395).

12          41.     The main dispute at trial for the assault and battery claims was whether the VA

13   police used reasonable force by keeping Johnson handcuffed and in discomfort for approximately

14   three straight hours.  While Johnson made a few passing complaints about being manhandled

15   when he was escorted out of the VA medical clinic by the police, the gravamen of his claim is the

16   prolonged handcuffing.

17          42.     Handcuffing an arrestee is, of course, a standard practice to prevent the possibility

18   of harm to the officers.  *See Avina*, 681 F.3d at 1131-32.  But "'overly tight handcuffing can

19   constitute excessive force.'"  *Thompson v. Lake*, 607 Fed. App'x 624, 625 (2015) (quoting *Wall v.*

20   *Cnty. of Orange,* 364 F.3d 1107, 1112 (9th Cir. 2004)).  As the Ninth Circuit has held, an arrestee

21   is "not required to show that the handcuffs caused visible physical injury."  *Id*.  It is enough that

22   the handcuffs caused "unnecessary pain."  *Id*. (internal citations omitted).  The resolution of a

23   handcuff claim is "likely to turn on the credibility of the witnesses."  *LaLonde*, 204 F.3d at 960.

24          43.     The evidence relevant to pain was somewhat mixed.  On the government's side,

25   Officer Cowin said that he checked the handcuffs' tightness and double-locked them to avoid

26   further tightening.  In addition, no evidence credibly links the major injuries Johnson claimed to

27   his shoulders and back to the handcuffing.  Johnson's own medical expert denied that the

28   handcuffs caused Johnson any new injury.  And the defense medical expert stated that, because the

United States District Court
Northern District of California

handcuff application involved mainly internal rotation of the arms, it would not have caused aggravation or exacerbation of Johnson's pre-existing injuries. The defense expert conceded, however, that the time Johnson spent in handcuffs likely caused a minor strain or sprain from confining his arms in one position for an extended period. Tr. 405:4-17 (Atkin).

44.    The facts and circumstances as whole establish that the handcuffing was unreasonable. The officers testified that Johnson was arrested and placed in handcuffs a few minutes after 10:45 a.m. and then kept in handcuffs until about the time of the medical exam at the County Jail, which occurred about 1:35 p.m. Johnson was also kept in handcuffs in the 20 to 40 minute wait in the VA holding cell, during the half hour drive to the County Jail, and another hour or so sitting in a chair in the sallyport outside the jail. In total, Johnson was cuffed for approximately three hours. This was an unusually long time to keep Johnson's arms pinned painfully behind his back, given his condition, complaints, and these circumstances. It is true that Johnson's conduct during the arrest and detention was not a model of self-restraint. Johnson admits that he yelled and cursed at the officers. But he also credibly testified that he told the officers about his shoulder pain, and that much of his yelling related to his discomfort in the handcuffs. The evidence shows that the officers heard and reacted to at least one complaint about shoulder pain. Tr. 507:4-7 (Johnson); Tr. 482:4-483:1 (Neeley). Johnson testified that by the time they reached the jail sallyport he was begging the officers for relief from the handcuffs, suggesting they could handcuff him to a trash can to release his arms. Tr. 513:7-18 (Johnson). Although the officers claim not to recall Johnson complaining about pain during this period, they do not deny that he did. Tr. 301:22-302:2, 302:10-20 (Cowin); Tr. 452:14-22 (Coulter).

45.    There is no dispute that the remaining elements of battery are met. *See Tekle*, 511 F.3d at 855. The officers intentionally handcuffed Johnson and kept him in handcuffs throughout the three hours, and there is no evidence that they made any effort to reduce the constriction of Johnson's arms by, for example, handcuffing him to "a fixed object, to a custodian," using multiple sets of handcuffs, or other options. *See Muehler v. Mena*, 544 U.S. 93, 109 n.6 (2005). In addition, Johnson did not consent to the extended handcuffing, and defendant's expert conceded that Johnson likely experienced increased pain and some strain due to the handcuffing.

46.     Consequently, taking the facts and circumstances as a whole, the Court finds that keeping Johnson in handcuffs for three straight hours was unreasonable and constitutes battery. The assault claim, however, cannot be sustained on these or any other facts in the trial record. Assault requires the threat of use of unreasonable force.  The trial record contains no evidence of the officers threatening to touch or harm Johnson with unreasonable force.  That negates the assault claim.  *See Pryor v. City of Clearlake*, 877 F. Supp. 2d 929, 953 (N.D. Cal. 2012).

47.     For the sake of completeness, the Court addresses the ancillary claim of unreasonable force in walking Johnson out of the medical clinic.  Johnson did not establish to a preponderance of the evidence that the VA police walked him to the VA holding cell with unreasonable speed, or harmed him through unreasonable use of a wrist lock when he refused to follow commands to continue walking.  Expert testimony established that an unreasonably applied wrist lock would have caused significantly more injury to the wrist or elbow than to the shoulder. Tr. 394:1-395:24 (Atkin).  But Johnson provided no evidence of any wrist or elbow pain or injury, undermining this claim.  No evidence of injury, residual pain or difficulty due to the walking was provided either.

48.     Johnson also did not show that Officer Cowin assaulted or battered him in the VA holding cell.  Officer Cowin did not clearly recall how many times he went into the holding cell or why, but that is not evidence that he mistreated Johnson in the cell.  Johnson's claim of violent injury in the cell is inconsistent with the fact that he passed medical triage at the sheriff's office without comment, and by expert testimony declining to find evidence of injury consistent with mistreatment.

49.     No evidence supports Johnson's claim that was he was injured by being forced into a car that was too small for him during transport to the County Jail.  Officer Cowin and CI Coulter testified that he was properly placed in a specially designed seat with his seat belt fastened for the drive.  Johnson's claims of violent injury are again inconsistent with the medical triage at the jail and by the previously discussed expert testimony.

### E.    Intentional Infliction of Emotional Distress

50.    Johnson did not prove intentional infliction of emotional distress by a preponderance of the evidence.  To carry this burden, Johnson must establish: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."  *Avina*, 681 F.3d at 1131 (citing *Hughes v. Pair*, 46 Cal.4th 1035, 95 Cal. Rptr. 3d 636 (2009)).  "Outrageous" conduct is that which is "so extreme as to exceed all bounds of that usually tolerated in a civilized community."  *Tekle*, 511 F.3d at 855 (internal quote omitted).  "Where reasonable persons may differ, the trier of fact is to determine whether 'the conduct has been sufficiently extreme and outrageous to result in liability.'"  *Id*. at 856 (citation omitted).

51.    The evidence does not show that either Officer Cowin, Officer Neeley, or CI Coulter engaged in extreme and outrageous conduct, or that any of their acts were undertaken with the intention of causing, or reckless disregard for the probability of causing, emotional distress to Johnson.  Johnson claims he suffered "torture" and humiliation when the officers' allegedly hurt him deliberately and took photos of him as "trophies."  But the weight of the credible evidence rebuts these allegations.  Tr. 287:10-19, 290:20-291:3, 307:4-7 (Cowin); Tr. 459:6-460:21 (Coulter); Tr. 491:15-22 (Neeley).  While the length of Johnson's wait time for booking was not short, the evidence indicates that he booked in a manner consistent with county jail procedures as testified to by a Sheriff's Department captain.

### F.    Damages

52.    Damages are awarded in FTCA actions "in accordance with the law of the place where the act or omission occurred."  28 U.S.C.A. § 1346(b)(1).

53.    In California, compensatory damages "generally include damages for pain and suffering caused by a defendant's breach of a noncontractual obligation."  *Marron v. Superior Court*, 108 Cal. App. 4th 1049, 1060 (2003) (citing Cal. Civ. Code § 3333).  These damages are intended to compensate the plaintiff for injury suffered, including physical pain, "fright,

nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." *Id*. (internal quote omitted).  General compensatory damages may be awarded without proof of pecuniary loss such as medical bills.  *See, e.g., Duarte v. Zachariah*, 22 Cal. App. 4th 1652, 1664-65 (1994).

54.     The facts show that Johnson experienced unnecessary pain as a result of being kept in tight handcuffs for three solid hours, and experienced a mild sprain or strain as a result.  For this pain and suffering, the Court awards $2,500.00.  Johnson has not met his burden of showing by a preponderance of the evidence that any other injury was actually or proximately caused by the unreasonable duration of his handcuffing on January 30, 2012.

**CONCLUSION**

In light of these findings of fact and law, judgment will be entered in favor of defendant the United States on all claims except for battery from the handcuffing.  On that claim, the Court awards Johnson $2,500.00.

**IT IS SO ORDERED.**

Dated: August 26, 2016

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

22